# UNITED STATES BANKRUPTCY COURT

# DISTRICT OF IDAHO

| | | |
|---|---|---|
| IN RE | ) | |
| | ) | **Case No. 08-20386-TLM** |
| **KURT G. TICKEMYER and** | ) | |
| **AMY L. TICKEMYER,** | ) | |
| | ) | **Chapter 7** |
| Debtors. | ) | |
| _____ | ) | |
| | ) | |
| **PETER OPTEKAR and** | ) | |
| **LEONA OPTEKAR,** | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | **Adv. No. 08-07012-TLM** |
| | ) | |
| **KURT G. TICKEMYER and** | ) | |
| **AMY L. TICKEMYER** | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

## MEMORANDUM OF DECISION
_____

Before the Court is an adversary proceeding in which Peter and Leona

Optekar ("Optekars" or "Plaintiffs") seek a judgment excepting from discharge

their claim against Debtors Kurt and Amy Tickemyer ("Debtors") under

§ 523(a)(2)(B), and to have Debtors' discharge denied under §§ 727(a)(2)(A),

MEMORANDUM OF DECISION - 1

(a)(3), (a)(4)(A), (a)(5), and (a)(7).[1]  The matter was tried on nine days over the

course of several months with the parties submitting written closings, after which

the matter was taken under advisement.  Having reviewed the record, arguments,

and applicable authorities, the Court now disposes of the matter with this

Memorandum of Decision, which constitutes the Courts findings of fact and

conclusions of law under Rule 7052.[2]

**FACTUAL BACKGROUND**

Debtors are husband and wife, residing in Coeur d' Alene, Idaho.  In 2001,

Debtors started a construction business, Garland Construction Services, Inc.

("Garland").  Shortly after its formation, Kurt[3] incorporated the business.  He and

Amy were the sole shareholders, with Kurt acting as president and Amy as vice

president of the corporation.  Amy also handled the bookkeeping for the company.

The business grew, as did Debtors' family.  Confronted with the challenges

of the increasing complexity of the business and the responsibilities of

---

[1]  Unless otherwise indicated, all chapter and section references are to the Bankruptcy
Code, 11 U.S.C. §§ 101–1532 (the "Code"), and all rule references are to the Federal Rules of
Bankruptcy Procedure 1001–9037.

[2]  At the close of trial, the parties were ordered to submit to the Court written closing
arguments.  *See* Doc. No. 83.  In their reply brief, Doc. No. 86, Plaintiffs objected to the
timeliness of Debtors' closing brief, Doc. No. 85, which was filed six and one-half hours after the
deadline set by this Court.  In response, Debtors filed an ex parte motion to enlarge the time for
filing their brief, Doc. No. 87.  In its discretion, the Court will hereby overrule Plaintiffs'
objection and consider Debtors' closing brief, thus rendering any additional decision on Debtors'
motion unnecessary.

[3]  For clarity, the Court will occasionally refer to Debtors by their first names.

MEMORANDUM OF DECISION - 2

motherhood, Amy decided to step away from her bookkeeping duties at Garland. In June 2004, Debtors hired Charlotte Carstensen to take over the bookkeeping. She functioned in that capacity until April 2005 when Kurt hired Lonnie Farmer. After Farmer's hiring, Carstensen worked primarily with accounts receivable, while Farmer handled the remainder of the bookkeeping responsibilities.

Over the years Kurt's parents, Gary and Jean Tickemyer (the "Tickemyers"), periodically gave money to Garland. The Tickemyers typically wired the funds directly into Garland's business account, although at times they also issued checks to Garland. *See*, *e.g.*, Ex. 112 at 5. These monies were used to cover payroll, health insurance premiums, bills owed to suppliers, and other expenses associated with the business. No formal arrangement existed between Kurt or Garland and Kurt's parents — *e.g.*, promissory notes, repayment terms, interest rates — although Kurt intended to have Garland repay his parents at some point in the future, and they in turn hoped to be repaid when the business became more profitable. While Kurt had Garland make payments to his parents when it could, *see* Ex. 113, much of what Garland received from them was never repaid.

Despite his parents' generosity, Kurt still needed additional funds to keep Garland afloat. In the summer of 2006, Debtors refinanced the mortgage on their home. Of the $550,000 borrowed, $300,000 was used to pay off Debtors' existing mortgage and the remaining $250,000 was infused into Garland. Following the

MEMORANDUM OF DECISION - 3

transaction, Garland began making Debtors' monthly mortgage payment of roughly $4,000 directly to the lender.

Even with the funds from the refinance, Garland continued to lose money. As a result, Kurt began exploring alternative sources of funding in early 2007. Part of this effort included  putting together, with the help of his staff, a package detailing Garland's finances to present to potential lenders.  Ex. 114.  Among the financial documents in this package was a "Balance Sheet" for Garland generated from QuickBooks, which detailed Garland's assets and liabilities as of December 31, 2006.  *Id.* at 11–12 ("Balance Sheet").  One of the assets listed in the Balance Sheet was "Shop Stock Inventory" of $178,457.02.

Among the potential lenders Kurt contacted was Peter Optekar, who Kurt had come into contact with when Garland worked as a plumbing subcontractor for Optekar's general contracting company.  Kurt arranged a meeting with Optekar at Optekar's home.  At that meeting, Kurt presented Optekar with the Garland financial package and a loan proposal of $200,000 with a 10% annual interest rate. After reviewing the financial package, including the Balance Sheet, and discussing Garland's financial condition, Optekar requested additional time to consider Kurt's proposal based on concerns he had relating to Garland's finances.

After further negotiations, a tour of Garland's shop, and consultation with

MEMORANDUM OF DECISION - 4

their attorney and accountant, the Optekars finally agreed to loan $202,000[4] to

Garland but with a 20% annual interest rate.  The loan was to be paid off in two

years through monthly payments of $3,903.76 and a final balloon payment of

$190,212.64.  Exs. 115 & 116.  Per the terms of the promissory note, the monthly

payments were to be made on or before the first of each month.  Ex. 116.  Debtors

personally guaranteed repayment of the note, Ex. 117, and as security for the loan

Garland pledged its equipment, inventory, accounts, general intangibles, vehicles,

and a leasehold interest in its shop located on Tracey Road in Hayden, Idaho, Exs.

115 & 118.  Garland also agreed, among other things, to: (1) not take on any debt

other than additional loans from the Optekars, debt incurred in the ordinary course

of business, or debt for taxes, assessments, and governmental charges; (2) pay all

debt Garland did incur as it became due and payable; (3) keep current its

obligations under its shop lease; and (4) not pay Kurt yearly compensation in

excess of $65,000.  Ex. 115 ¶ 4.  The loan documents were executed on February

14, 2007.  *See* Exs. 115–118.

The Optekars loan, however, proved insufficient to cure Garland's cash

flow problems.  In January 2008, Garland was evicted from its Tracey Road shop

in Hayden because it was delinquent on the lease, and Kurt was forced to move

---

[4]  Optekar added $2,000 to the loan principal to be used by Kurt to cover the attorney's
fees incurred in preparing the loan documents.

MEMORANDUM OF DECISION - 5

much of his equipment, tools, and inventory into storage buildings.  Garland was

also falling behind on its tax obligations.

At the end of January 2008, Optekar approached Kurt with a proposed

workout agreement.  Although Garland had not missed a payment to Optekar,

those payments had not always been timely made.  *See* Ex. 161.  Additionally,

Garland had violated the loan agreement with Optekar by failing to pay its taxes

and keep its lease current.  *See* Ex. 115 ¶ 4.  Optekar was concerned about

Garland's finances, and in particular Garland's debt to the IRS and the existence

of a resulting tax lien on Garland's bank accounts.  Kurt discussed the terms of the

proposed workout with Optekar but did not enter into the agreement.

On March 11, 2008, Optekar seized Garland's bank accounts based on

Garland's default under the loan agreement.  On March 14, 2008, Debtors caused

Garland to file a voluntary petition for relief under chapter 7.  Garland's

schedules, signed by Kurt and filed on March 28, 2008, listed the Tickemyers and

Debtors themselves as unsecured creditors with claims of $260,000 and $175,000,

respectively, stemming from "operating capital loan[s]."  Ex. 134 at 10 & 12.

Garland's schedules also listed the Optekars as secured creditors with a claim of

$196,000.  *Id.* at 8.  Approximately three months later, on June 26, 2008, Debtors

filed a joint chapter 7 petition.  Debtors also listed the Optekars as secured

MEMORANDUM OF DECISION - 6

creditors in their chapter 7 case.[5]

Shortly after filing their joint petition, Debtors moved from their home,

which was being foreclosed on, to a rental house.

**DISCUSSION AND DISPOSITION**

### A.   Nondischargeability under § 523(a)(2)(B)

The Court first addresses Plaintiffs' assertion that their claim against

Debtors, based on Debtors' personal guaranty liability, is nondischargeable under

§ 523(a)(2)(B).   Section § 523(a)(2) excepts from an individual's discharge under

§ 727 any debt

> for money, property, services, or an extension, renewal, or
> refinancing of credit, to the extent obtained by—
> . . .
>    (B) use of a statement in writing—
>       (i) that is materially false;
>       (ii) respecting the debtor's or an insider's financial condition;
>       (iii) on which the creditor to whom the debtor is liable for
>       such money, property, services, or credit reasonably relied;
>       (iv) that the debtor caused to be made or published with intent
>       to deceive.

Section 523(a)(2)(B).  Thus, to prevail on a claim under § 523(a)(2)(B) a creditor

must show, by a preponderance of the evidence: (1) a written representation of

fact by the debtor concerning the debtor's or an insider's financial condition (2)

---

[5]   The Court takes judicial notice of the filings of record in both the Garland corporate bankruptcy case, Case No. 08-20111-TLM, and Debtors personal bankruptcy case, Case No. 08-20386-TLM.  *See* Fed. R. Evid. 201.

MEMORANDUM OF DECISION - 7

that was material, (3) that the debtor knew at the time to be false, (4) that was

made with the intention of deceiving the creditor, (5) upon which the creditor

reasonably relied, and (6) that proximately resulted in damage to the creditor.  *See*

*Wells Fargo Bank, N.A. v. Covino (In re Covino)*, 04.3 I.B.C.R. 98, 105 (Bankr.

D. Idaho 2004) (quoting *Candland v. Ins. Co. of N. Am. (In re Candland)*, 90 F.3d

1466, 1469 (9th Cir. 1996)).  In considering a claim under § 523(a)(2)(B), the

Court must construe the statute strictly against the objecting creditor and liberally

in favor of the debtor so as to effectuate the Bankruptcy Code's purpose of giving

debtors a fresh start.  *See*, *e.g.*, *Jet v. Sicroff (In re Sicroff)*, 401 F.3d 1101, 1103

(9th Cir. 2005).

    For purposes of § 523(a)(2)(B) "material falsity in a financial statement can

be premised upon the inclusion of false information or upon the omission of

information about a debtor's [or insider's] financial condition."  *Tallant v.*

*Kaufman (In re Tallant)*, 218 B.R. 58, 71 (9th Cir. BAP 1998) (quoting *First*

*Interstate Bank of Nev. v. Greene (In re Greene)*, 96 B.R. 279, 283 (9th Cir. BAP

1989)).  Thus, "the omission, concealment or understatement of material liabilities

can constitute a materially false statement and may lead to nondischargeability of

the debt."  *Id.*

    Plaintiffs contend that the Balance Sheet provided to them by Kurt in

connection with the Garland loan proposal, Ex. 114 at 11–12, contained false

MEMORANDUM OF DECISION - 8

representations that were intended to deceive Plaintiffs into loaning funds to
Garland.  Specifically, they assert the Balance Sheet omitted the loans Garland
received from the Tickemyers and Debtors, and that it grossly exaggerated
Garland's shop stock inventory.  Debtors concede the representations objected to
by Plaintiffs concerned an "insider"[6] of Debtors, and that they were "material," but
maintain that Plaintiffs have failed to prove the remaining elements under
§ 523(a)(2)(B).

### 1.    Knowledge and intent to deceive

#### a.    Tickemyers' loans

The Balance Sheet did not include as a liability of Garland the loan from
Kurt's parents.  But Debtors listed the Tickemyers as creditors in Garland's
bankruptcy schedules with an unsecured claim of $175,000 stemming from an
"operating capital loan."  *See* Ex. 134 at 10.  This amount represented funds the
Tickemyers had given Debtors over the years to help with the business that had
never been repaid.  Debtors contend that this "loan" from Kurt's parents was not
included in the Balance Sheet because it was not a loan, but rather a "gift."

The Court finds Debtors' explanation lacking.  On one hand, no documents
were executed with respect to the funds given to Garland by the Tickemyers, nor

---

[6] "Insider" is defined by the Bankruptcy Code to include, where the debtor is an
individual, a "corporation of which the debtor is a director, officer, or person in control."  Section
101(31)(A)(iv).  Garland, a corporation, was clearly an insider of Debtors under this definition as
Debtors were its sole shareholders and officers.

MEMORANDUM OF DECISION - 9

were there any repayment terms established.  On the other hand, Kurt expressed an

intent to have Garland repay the funds, as it could, and the Tickemyers in fact

received some repayments, including work done on their home by Garland at no

charge.  Additionally, the Tickemyers testified that their hope was to be repaid at

some point when the business became more profitable.  Both Carstensen and

Farmer, Garland bookkeepers, recalled Kurt referring to the funds he received

from his parents as "loans."  And Kurt had Farmer track the funds Garland

received from, and repaid to, his parents — though not on the Garland books

because he did not want potential lenders to see it as an additional liability of the

business.  Per his instructions, Farmer kept a separate Excel spreadsheet

documenting the balance owed his parents.  Finally, as noted above, Debtors listed

the Tickemyers as loan creditors on Garland's bankruptcy schedules.[7]

Upon consideration of the evidence, the Court finds that Kurt and the

Tickemyers treated the Tickemyers' contributions as loans to Garland, albeit

informal ones.  Kurt thus knew Garland owed his parents substantial amounts at

---

[7]   Statements in bankruptcy schedules are executed under penalty of perjury and when
offered against a debtor are eligible for treatment as judicial admissions.  *See, e.g.*, *In re Roots
Rents, Inc.*, 420 B.R. 28, 40 (Bankr. D. Idaho 2009) (quoting *In re Bohrer*, 266 B.R. 200, 201
(Bankr. N.D. Cal. 2001)).  The testimony of Kurt and Gary Tickemyer that the motive for listing
the Tickemyers as creditors in Garland's schedules was to secure a tax benefit for the Tickemyers
does not nullify Debtors' sworn statements.  Those representations are considered by the Court as
evidentiary admissions.  *Id.*  Furthermore, the Court finds the strategic manner in which Debtors
initially approached the inclusion of the Tickemyers' loan in Garland's schedules, and Debtors'
eagerness to now distance themselves from that assertion when it no longer serves their interest,
indicative of a manipulative intent.

MEMORANDUM OF DECISION - 10

the time he was soliciting funds from Plaintiffs, yet that liability was not included in the Balance Sheet. The Court further concludes that Kurt, by instructing Farmer to not keep the loan on Garland's books, intended to, and in fact did, conceal Garland's liability to his parents from potential third-party lenders, including the Optekars, with the objective of improving the company's ability to secure funding.

Kurt argues he merely relied on Garland's bookkeepers, Carstensen and Farmer, who were ultimately the ones responsible for entering Garland's financial information and generating the Balance Sheet. Consequently, according to Kurt, he should not be held responsible for any falsities that may have been contained in the Balance Sheet. However, this argument fails in light of the active role Kurt played in ensuring the loan was not on Garland's books in the first instance, the conflicting evidence regarding his involvement in and awareness of Garland's finances, and the implausability of his asserted lack of knowledge concerning a business that constituted his primary source of income and debt. In short, the Court finds Kurt's assertion not credible.

### b. Debtors' loan

Plaintiffs contend that Kurt also failed to include Debtors' loan to Garland in the Balance Sheet. However, the Balance Sheet does include a line item for a "shareholder loan payable" of $124,644.49. Ex. 114 at 12. Further, when

MEMORANDUM OF DECISION - 11

questioned concerning the shareholder loan, Farmer indicated that item

represented the amount Garland still owed Debtors from what they had previously

loaned to the company.  While Optekar testified that Kurt described the

shareholder loan payable to him as funds Debtors inherited and subsequently

contributed to the company, and the loan amount reflected in the Balance Sheet is

considerably less than the $260,000 claim Debtors listed in Garland's schedules,

*see* Ex. 134 at 12, the conflicting evidence prevents the Court from finding there

was a complete omission of Garland's  liability to Debtors.

The Court's inquiry does not end there.  Evidence proving Kurt knew

Garland's obligation to Debtors was significantly understated in the Balance Sheet

would support a conclusion that he intended to deceive Plaintiffs with that

understatement.  However, preponderating evidence is lacking.  There is no

evidence Kurt had Garland's books manipulated to show a lower shareholder loan

balance, as was the case with the Tickemyers' loan.  Nor is there any evidence

showing he knew that number to be inaccurate when he provided it to Plaintiffs.

Though Garland's liability to Debtors may have been understated (at least based

on Garland's later-filed bankruptcy schedules), the discrepancy between the

Balance Sheet and the schedules alone is insufficient to find the knowledge of

falsity and intent to deceive required by § 523(a)(2)(B).

MEMORANDUM OF DECISION - 12

### c.    Shop stock inventory

The third representation Plaintiffs complain of is the shop stock inventory amount reflected in the Garland Balance Sheet.  The Balance Sheet portrayed a shop stock inventory of $178,457.02.  Kurt knew that this number was undoubtedly inaccurate.  He testified that Garland did not have a functioning system in place to track outgoing inventory.  As a result, and as explained by Carstensen and Farmer, inventory would be counted as it came into the business but was not reduced accordingly as inventory was used in Garland jobs, thus resulting in an ever-increasing inventory number that was well above what Garland actually had in stock.  While Garland had previously used physical inventories to determine its actual inventory, the last physical inventory performed prior to creation of the Balance Sheet in early 2007 was conducted some time in 2004, as Kurt considered regular physical inventories to be cost prohibitive.

Both Carstensen and Farmer alerted Kurt to this inventory problem, but no meaningful change was ever made.  Thus, at the time the Balance Sheet was provided to Plaintiffs, Kurt knew not only that the inventory number was inaccurate but that it was much higher than what Garland actually had in stock, giving the appearance that Garland had greater assets than it actually did. Inventory was one of Garland's three largest assets according to the Balance Sheet, with accounts receivable ($194,405.07) and vehicles ($194,457.90) being

MEMORANDUM OF DECISION - 13

the other two.  It was also one of the items of collateral pledged as security for the Optekars' loan to Garland.

Based on this evidence and Kurt's business experience, the Court concludes that Kurt knew Garland did not have $178,457.02 in shop stock inventory at the time he provided the Balance Sheet to Plaintiffs.  He provided the Balance Sheet, which included this misinformation, intending that Plaintiffs would rely on the representations regarding Garland's assets, including the shop stock inventory, in deciding whether to extend credit to Garland.  Kurt's representation regarding the state of Garland's inventory was thus knowingly false and made with intent to deceive Plaintiffs for the purpose of securing credit for Garland.

### 2.    Reasonable reliance

The Court further finds that Plaintiffs reasonably relied on Kurt's representations concerning Garland's financial condition.

Under the standard of reasonable reliance, investigations may not be required, and "assertions of fact as to the financial status of corporations, and similar matters may justifiably be relied on without investigation, not only where such investigation would be burdensome or difficult but likewise where the falsity of the representation might be discovered with little effort by means easily at hand."  *Covino*, 04.3 I.B.C.R. at 107 (quoting *Candland*, 90 F.3d at 1469).

Plaintiffs relied on Kurt's representations concerning Garland's liabilities

MEMORANDUM OF DECISION - 14

(which omitted the Tickemyers' loan) and assets (which included the inflated stock shop inventory) when they decided to loan Garland money.  As noted, the shop stock inventory was one of the largest assets listed in the Balance Sheet and it was one of the items of collateral providing security to the Optekars.  Similarly, the $175,000 loan to the Tickemyers would have been Garland's single largest liability according to the Balance Sheet, had it not been omitted.  Optekar and Kurt reviewed the Balance Sheet together before any decision was made to loan money to Garland, and Optekar testified at trial that Plaintiffs relied on the representations in the Balance Sheet in determining whether to loan funds to Garland.

In addition, Plaintiffs' reliance was reasonable.  There was no evidence of information available to Plaintiffs that would have suggested Kurt's representations in the Balance Sheet were inaccurate.  Kurt was the owner and president of Garland, and it was reasonable for Plaintiffs to presume he was both aware of Garland's finances and accurately portraying the same in the Balance Sheet he had provided.  Although Plaintiffs could have insisted on a physical inventory prior to making the loan, such an effort was not required for them to reasonably rely on the representations in the Balance Sheet.

Debtors argue that even if Plaintiffs relied on the Balance Sheet, that reliance was not reasonable because no reasonable creditor would have extended

MEMORANDUM OF DECISION - 15

Garland credit upon review of the Balance Sheet as it revealed an unprofitable business with liabilities in excess of assets.

Debtors argument is misplaced. Under § 523(a)(2)(B) the Court is not concerned with whether Plaintiffs made a good business decision in loaning money to Garland. Rather, the inquiry is focused on whether it was reasonable for them to rely on the representations Kurt made as accurately reflecting the financial status of Garland, no matter how poor it might have objectively appeared. There is little doubt a loan to Garland carried a heightened degree of risk. That much is evidenced by Garland's difficulties in securing alternative financing, and by the onerous terms of the loan agreement eventually entered into between Plaintiffs and Garland, which included a 20% interest rate. Nevertheless, Plaintiffs were entitled to rely on Kurt's representations regarding the financial condition of Garland in order to determine just how much risk they were willing to tolerate.

### 3.     Proximate causation and damages

The final element of § 523(a)(2)(B) is proximate causation of injury to the creditor. Optekar testified that Plaintiffs relied on the Balance Sheet, and in particular the representations regarding Garland's assets and liabilities, in deciding whether to loan money to Garland. He also testified that, had he been aware of the true state of Garland's finances, including the Tickemyers' loan and the actual inventory in stock, he would not have loaned the money. Based on the demonstrated caution with which Optekar approached the loan and the import of

MEMORANDUM OF DECISION - 16

the misrepresentations in the financial statement, the Court finds this testimony to be credible. Therefore, it concludes that but for Kurt's omission of the Tickemyers' loan and his representation of $174,457.02 in shop stock inventory, Plaintiffs would not have loaned Garland the $202,000. The injury to Plaintiffs is thus $140,765.60, the remaining balance on the loan principal, plus accrued interest.[8]

### 4.    Amy's liability

Although the evidence is sufficient to prove a § 523(a)(2)(B) cause of action against Kurt, the same cannot be said as to Amy. "A marital union alone, without a finding of a partnership or other agency relationship between spouses, cannot serve as a basis for imputing fraud from one spouse to the other." *Covino*, 04.3 I.B.C.R. at 105 (citing *Tsurukawa v. Nikon Precision, Inc. (In re Tsurukawa)*, 258 B.R. 192, 198 (9th Cir. BAP 2001)). Because no evidence of a partnership or agency relationship between Kurt and Amy was presented, Plaintiffs needed to establish a cause of action against Amy separate and apart from any question of Kurt's liability under § 523(a)(2)(B). They failed to do so. Plaintiffs presented no evidence of Amy's knowledge of Garland's finances or involvement in securing the loan from Plaintiffs, other than her signature as a guarantor. Indeed, the

---

[8]  At trial, Plaintiffs produced a payment history for their loan to Garland, to which Debtors did not object. Ex. 161. With Debtors' payments and the proceeds from various items of collateral Plaintiffs have liquidated and applied toward the loan, the remaining principal balance is $140,765.60, and as of March 3, 2010, the unpaid accrued interest on the loan was $24,305.89. *See id.*

MEMORANDUM OF DECISION - 17

evidence indicated that at the time in question she had little to do with operating the business.  Therefore, the § 523(a)(2)(B) cause of action against Amy will be dismissed.

Based on the reasons set forth above, Kurt's personal guaranty debt on the Garland promissory note in favor of Plaintiffs is nondischargeable under § 523(a)(2)(B) in the amount of $140,765.60 plus accrued interest.  While Plaintiffs have also requested an award for attorney's fees incurred in pursuit of their § 523(a)(2)(B) claim, relying upon this Court's decision in *Kilborn v. Haun (In re Haun)*, 396 B.R. 522 (Bankr. D. Idaho 2008), the Court will first turn to Plaintiffs' objections to discharge under § 727(a) before addressing the fee request.

### B.    Denial of Discharge under § 727(a)

Plaintiffs, in addition to seeking nondischargeability of the debt owed them, seek a judgment denying Debtors' discharge in full under various subsections of § 727(a).  Though in one sense redundant relief as to Plaintiffs (and potentially counterproductive relief in that, if successful, all creditors will be able to pursue Debtors post-bankruptcy), the causes were tried and submitted, and will be addressed.

Denial of discharge is among the harshest sanctions this Court can levy on a debtor.  Accordingly, the statutory requirements for denying a debtor's discharge under § 727 are strictly construed against objecting creditors and in favor of

MEMORANDUM OF DECISION - 18

debtors. *See Sterling Int'l, Inc. v. Thomas (In re Thomas)*, 03.3 I.B.C.R. 178, 181,

2003 WL 21981707, at *6 (Bankr. D. Idaho 2003). "The reasons for denial of

discharge must be real and substantial rather than technical and conjectural."

*Thomas*, 03.3 I.B.C.R. at 181, 2003 WL 219 81707, at *6 (quoting 6 Collier on

Bankruptcy ¶ 727.01 (Alan N. Resnick & Henry J. Sommer eds., 15th ed. rev.

2002)). The standard of proof in an action under § 727(a), like § 523(a)(2), is

preponderance of the evidence. *Searles v. Riley (In re Searles)*, 317 B.R. 368, 376

(9th Cir. BAP 2004).

The Court concludes Plaintiffs have meet their burden of proof under

§ 727(a)(4)(A).

Section 727(a)(4)(A) states: "The court shall grant the debtor a discharge,

unless . . . the debtor knowingly and fraudulently, in or in connection with the case

— made a false oath or account." To prevail on a § 727(a)(4) claim a plaintiff

must show, by a preponderance of the evidence, that: "(1) the debtor made a false

oath in connection with the case; (2) the oath related to a material fact; (3) the oath

was made knowingly; and (4) the oath was made fraudulently." *Retz v. Samson

(In re Retz)*, 606 F.3d 1189, 1197 (9th Cir. 2010) (quoting *Roberts v. Erhard (In re

Roberts)*, 331 B.R. 876, 882 (9th Cir. BAP 2005)).

### 1.      Debtors made false oaths in connection with their bankruptcy case

"A false statement or an omission in the debtor's bankruptcy schedules or

MEMORANDUM OF DECISION - 19

statement of financial affairs can constitute a false oath." *Id.* at 1196 (quoting

*Khalil v. Developers Sur. & Indem. Co. (In re Khalil)*, 379 B.R. 163, 172 (9th Cir.

BAP 2007), *aff'd* 578 F.3d 1167, 1168 (9th Cir. 2009) (adopting the BAP's

statement of applicable law)).[9]  Plaintiffs have identified five items of personal

property they believe Debtors fraudulently omitted from their originally filed

bankruptcy schedules — a Handel patinated metal and glass table lamp, a six-

piece sterling silver tea and coffee set, a sterling silver tray, a walnut office desk,

and a lady's diamond and gold wristwatch.  Of these five items, Debtors

acknowledge they omitted at least four — the tea set, tray, office desk, and

wristwatch.  *See* Doc. Nos. 56 & 68 (Amended Schedules B).[10]

     Additionally, Plaintiffs have, by a preponderance of the evidence,

---

[9]  As this Court explained in *Murphy v. Vanschoiack (In re Vanschoiack)*, 356 B.R. 56, 63 n.6 (Bankr. D. Idaho 2006):

> A debtor is required to make full and complete disclosure of assets, liabilities and transactions.  This requirement is enforced, *inter alia*, by § 727(a)(4).  The function of the requirement is to ensure accurate and dependable information is given to the Court, trustee, and creditors upon which they can rely without the need for additional inquiry.  Debtors may not elect what to disclose; all property and interests in property must be disclosed.

(internal citations omitted).

[10]  Debtors filed an amended Schedule B on March 2, 2010, the day before trial in this matter commenced, adding the silver tea set and tray to the list of their personal assets.  Doc. No. 56.  Then, on November 30, 2010, while the trial was still ongoing, Debtors filed a second amended Schedule B, this time adding for the first time Debtors' interests in an office desk, two silver-plated candle stands, a music stand, an antique sofa and wall table, a diamond and gold wristwatch, and a gold wedding band with diamond.  Doc. No. 68.  Though each of these items was addressed at trial, in their closing brief Plaintiffs only specifically identify the tea set, tray, desk, and watch.

MEMORANDUM OF DECISION - 20

established that Debtors' assets at the time of filing also included the antique

Handel table lamp.  Debtors contend that this item was not listed on their

schedules because they gifted it to Kurt's parents, the Tickemyers.  The evidence

presented suggests otherwise.

Amy and Kurt's father, Gary Tickemyer, both testified that Debtors gave

the Handel lamp to Kurt's parents as a gift in late summer or early fall of 2007.

However, this testimony contradicts that of Rachael Remmick, Amy's sister, and

Gary Hutton, Amy's father.  According to Remmick, she saw the Handel lamp in

Debtors' home in 2008.  Hutton also testified that he saw the lamp in Debtors'

home in 2008, just before Debtors moved from that home into a rental house, and

that Amy told him they had stored the lamp at the home of Kurt's parents because

the rental house was too small to fit all of Debtors' belongings.  In addition,

Debtors did not list any gifts to Kurt's parents in their statement of financial affairs

("SOFA") for the year preceding their bankruptcy filing.  *See* Doc. No. 22. Yet,

based on Amy's testimony, the gifting of the Handel lamp would have occurred

during that one-year period.

Upon consideration of this evidence, including observations of the

witnesses in open court, the Court finds the statements of Remmick and Hutton

more credible.  Thus, at the time of filing, Debtors' assets included the antique

Handel lamp, regardless of whether it was actually in Debtors' physical possession

at that time or was being stored at the Tickemyers' home.

MEMORANDUM OF DECISION - 21

### 2.      Debtors' false oaths related to material facts

"A fact is material if it bears a relationship to the debtor's business

transactions or estate, or concerns the discovery of assets, business dealings, or the

existence and disposition of the debtor's property." *Retz*, 606 F.3d at 1198

(quoting *Khalil*, 379 B.R. at 173). "The recalcitrant debtor may not escape a

section 727(a)(4)(A) denial of discharge by asserting that the admittedly omitted

or falsely stated information concerned a worthless relationship or holding; such a

defense is specious." *Vanschoiack*, 356 B.R. at 64 (quoting *Weiner v. Perry,*

*Settles & Lawson, Inc. (In re Weiner)*, 208 B.R. 69, 71 (9th Cir BAP 1997), *rev'd*

*on other grounds*, 161 F.3d 1216 (9th Cir. 1998)). And, "[t]he asset's value need

not be 'material,' nor must a debtor 'succeed in harming creditors to warrant

denial of discharge." *Id.* (citing *Bernard v. Sheaffer (In re Bernard)*, 96 F.3d

1279, 1281–82 (9th Cir. 1996)).

Here, Debtor's omissions were material. They concerned discovery of

estate assets and the possible disposition of property. While the omitted items

need not have value to be material, *see id.*, there is evidence, although by no

means conclusive, that the assets may result in value to the estate.[11]

For example, both parties produced appraisals of the silver tea set and tray,

---

[11]   Debtors filed an amended Schedule C in conjunction with their amended Schedules B, in which they claim exemptions in the previously omitted items. Doc. No. 69. The chapter 7 trustee has objected to Debtors' amended claims of exemption. *See* Doc. No. 71.

MEMORANDUM OF DECISION - 22

which, as might be expected, varied greatly one from another.[12]  According to

Plaintiffs' appraisal, the tea set and tray combined are worth $8,799.  *See* Ex. 169.

Debtors produced three separate appraisals — one at $175 to $200, Ex. 243, a

second at $575, Ex. 244, and a third at $1,500 to $2,000, Ex. 245.[13]  Though on

this cold record, and without the benefit of live testimony and cross-examination,

it would be effectively impossible to weigh this conflicting evidence, the Court

need not do so to resolve the issues currently before it in this proceeding.  It is

enough to recognize that the omitted assets had some value to the estate.[14]

> **3.    Debtor's false oaths were made knowingly and fraudulently**

Section 727(a)(4)(A) requires that a false oath be made knowingly.  A

debtor acts knowingly in making a false oath "if he or she acts deliberately and

consciously."  *Retz*, 606 F.3d at 1198 (quoting *Khalil*, 379 B.R. at 173).  The

Court must also find that the false oath was made fraudulently.  *Id.*  To

demonstrate fraudulent intent, a plaintiff must show that the false oath was made

---

[12]  The parties stipulated to the admission of the appraisals, and that any question of value would be submitted solely thereupon, without testimonial support or cross-examination. Though perhaps convenient to counsel, it was an ill-considered and unworkable approach.

[13]  The Court notes that despite these widely varying appraisals, Debtors chose to ascribe a value of $200 to the silver tea set and tray in their amended Schedule B.  *See* Doc. No. 56.

[14]  Although Debtors did not list the Handel lamp in their schedules, and thus have not ascribed a value to that item, the evidence produced at trial, which consisted of estimated auction values used at the time Amy obtained the lamp from the estate of her godmother, Ruth Tippet, indicated a value for the lamp of $6,000.  *See* Ex. 101 at 2.  Though this evidence lacks the reliability to support a definite finding on value, it does suggest the lamp, like the tea set and tray, had some value to the estate.

MEMORANDUM OF DECISION - 23

with the intention and purpose of deceiving the creditors or trustee — that is, he must show actual intent. *Id.* at 1198–99. Actual fraudulent intent is usually proven by circumstantial evidence, including inferences drawn from the debtor's conduct. *Id.*

The circumstances in this case indicate an intent to deceive. Debtors' contention is that they inadvertently failed to schedule the omitted items. While Debtors subsequently amended their bankruptcy schedules to include these items, that occurred only after Plaintiffs identified them in this adversary proceeding. Based on Debtors' own valuations (as contained in their amended Schedules B, Doc. Nos. 56 & 68), the omitted items were among Debtors' most valuable household goods.[15] Furthermore, Remmick testified that Amy gave her the silver tea set and tray for safekeeping some time in 2008, at which time Amy told her that because of the bankruptcy she was concerned about having certain items in her home, including the tea set and tray, because of their value.[16]

On the whole of this evidence, the Court concludes that Debtors knowingly omitted the Handel lamp, sterling silver tea set and tray, walnut office desk, and

---

[15]   Debtors value the tea set and tray at $200, the desk at $125, the sofa/wall table at $200, the wristwatch at $300, and the wedding band at $300. Doc. No. 68. The only other personal property listed in Debtors' schedules with higher or equivalent values are: an investment portfolio ($6,298.05), a piano ($300), a lawn mower ($200), and some hand tools ($500). *Id.*

[16]   Remmick's testimony was vague as to whether this conversation with Amy took place before or after Debtors filed their petition. However, the lack of clarity on the exact timing of the conversation does not significantly impact the probative value of this testimony in determining Amy's intent with respect to the omitted items.

MEMORANDUM OF DECISION - 24

diamond and gold wristwatch from their bankruptcy schedules with the fraudulent intent of concealing those items from creditors and the trustee. Debtors' discharge will therefore be denied under § 727(a)(4)(A).

Given Debtors' discharge will be denied under § 727(a)(4), the Court need not, and does not, address Plaintiffs' additional arguments under §§ 727(a)(2)(A), (a)(3), (a)(5), and (a)(7), which would provide only superfluous relief.

### C.    Attorney's fees

As noted above, Plaintiffs request an award of attorney's fees incurred in this litigation. Plaintiffs' are not entitled to attorney's fees incurred in pursuit of their causes of action under § 727(a). *See Tuloil, Inc. v. Shahid (In re Shahid)*, 254 B.R. 40, 44–45 (10th Cir. BAP 2000) (concluding § 727 does not provide a statutory basis for an award of attorney's fees, and that attorney's fee clause in creditor's contract with debtor was inapplicable because action under § 727 was not an action on the contract).

However, Plaintiffs may recover attorney's fees incurred in connection with their 523(a)(2)(B) litigation if they "would be entitled to fees in state court for establishing those elements of the claim which the bankruptcy court finds support a conclusion of nondischargeability." *Haun*, 396 B.R. at 528. Plaintiffs assert that they would be entitled to fees in state court under Idaho Code § 12-120(3) because this proceeding arose out of a "commercial transaction."

Idaho Code § 12-120(3) provides:

MEMORANDUM OF DECISION - 25

> In any civil action to recover on an open account, account stated, note, bill, negotiable instrument, guaranty, or contract relating to the purchase or sale of goods, wares, merchandise, or services *and in any commercial transaction* unless otherwise provided by law, the prevailing party shall be allowed a reasonable attorney's fee to be set by the court, to be taxed and collected as costs.

(Emphasis added.)  To award fees under this provision, the Court must determine if Plaintiffs are a prevailing party and whether the gravamen of the § 523(a)(2)(B) litigation dealt with a "commercial transaction."  *Haun*, 396 B.R. at 530.  "Neither the absence of a proven contract, nor the fact that [Plaintiffs'] claim is based on fraud, precludes operation of Idaho Code § 12-120(3)."  *Id.* (citing *Blimka v. My Web Wholesaler, LLC*, 152 P.3d 594, 599–600 (2007)).

Plaintiffs prevailed on their § 523(a)(2)(B) cause of action, but only as to Kurt.  Accordingly, any liability for attorney's fees will attach to him alone.[17]  The question thus becomes whether the action against Kurt involved a commercial transaction for purposes of Idaho Code § 12-120(3).

"Commercial transaction" is defined by the Idaho Code as "all transactions except transactions for personal or household purposes."  Idaho Code § 12-120(3).

---

[17]  Notwithstanding Amy's lack of personal liability for attorney's fees related to the § 523(a)(2)(B) litigation, any award against Kurt for such fees is presumed to be a community debt.  *See United States Trustee v. Warr (In re Warr)*, 410 B.R. 891, 896 (Bankr. D. Idaho 2009) ("In Idaho, indebtedness incurred by a spouse during marriage is presumed to be a community obligation.") (citing *Simplot v. Simplot*, 526 P.2d 844, 851 (Idaho 1974)).  Because no evidence was presented to rebut this presumption, Debtors' community property, but not Amy's separate property, will be subject to any fee award entered by the Court.  *See* §§ 524(a)(3) and 541(a)(2); *Petro Concepts, Inc. v. Mundt (In re Mundt)*, 2009 WL 5386131, at *11 n.30 (Bankr. D. Idaho Dec. 9, 2009).

MEMORANDUM OF DECISION - 26

Plaintiffs' loan to Garland, the gravamen of their § 523(a)(2)(B) claim, was for business investment and profit. Such a transaction is not for personal or household purposes, but rather a commercial transaction made for business and investment purposes. Because Plaintiffs are the prevailing party and the gravamen of their claim is a commercial transaction, they are entitled to reasonable attorney's fees. Plaintiffs are also entitled to costs under Rule 7054(b) and LBR 7054.1. Accordingly, they may submit a memorandum of costs and attorney's fees for review by this Court.

**CONCLUSION**

Based on the foregoing, Debtors' discharge will be denied under § 727(a)(4)(A). Further, Plaintiffs' claim against Kurt, in the amount of $140,765.60 plus accrued interest, will be excepted from discharge under § 523(a)(2)(B). Plaintiffs will be awarded costs, as well as attorney's fees related to the § 523(a)(2)(B) action as against Kurt.

Counsel for Plaintiffs shall submit a proposed form of judgment consistent herewith.

DATED: March 31, 2011

TERRY L. MYERS
CHIEF U. S. BANKRUPTCY JUDGE

MEMORANDUM OF DECISION - 27